UNITED STATES of America

v.

Reginald SHEPARD, Defendant.

No. Crim. 98–10262–NG.

United States District Court,
D. Massachusetts.

Jan. 20, 2000.

Nadine Pellegrini, U.S. Attorney's Office, Boston, MA, for plaintiff.

Linda J. Thompson, Jacobson & Thompson, P.C., Springfield, MA, for defendant.

**SENTENCING MEMORANDUM**

GERTNER, District Judge.

I. *GUIDELINE CALCULATIONS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .564

II. *FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .564
    A. *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .564
    B. *Criminal History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .565
        1. *The Breaking and Entering Convictions* . . . . . . . . . . . . . . . . . . . . . . . . .565
            a. *April 18, 1989* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .566

      b.  *May 23, 1989* ..............................................566
      c.  *March 29, 1991* ..........................................566
      d.  *July 18, 1991* ............................................567
      e.  *February 4, 1994* .......................................567
   2.  *The Remainder of Shepard's Record* ..............................567
 C.  *This Incident* ................................................567
 D.  *Other Facts* .................................................567

III.  *LEGAL ANALYSIS* ..............................................568
 A.  *Armed Career Criminal* ......................................568
 B.  *Inadequate Criminal History Category* ..............................570
   1.  *Whether an Upward Departure is Warranted* .....................571
   2.  *Extent of Departure* ........................................572
      a.  *Degree of Departure* .....................................572

Reginald Shepard ("Shepard") pleaded guilty to one count of Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g). At the time of the offense, Shepard had a number of prior state criminal convictions for breaking and entering. The government argued that at least five of these convictions were "violent felonies" within the meaning of the Armed Career Criminal Act ("ACC") because they qualified as "burglaries" under 18 U.S.C. § 924(e)(2). *See* U.S.S.G. § 4B1.4. Shepard disagreed. The resolution of this dispute was critical: Shepard faced an increase in his sentence of approximately twelve years if I adopted the government's position.[1]

The substantive issue, whether Shepard's breaking and entering convictions constitute "burglaries," raised an even more fundamental one—how far may a court look beyond the language of the indictment to which the defendant pled guilty or of which he was convicted, to determine the character of a defendant's prior convictions.

The Sentencing Guidelines and the ACC attach substantial penalties not merely to the *fact* of a prior record, but to the *nature* of that record. Since these extraordinary consequences were never anticipated when the defendant pled guilty or was convicted in state court, they were never adjudicated by a court or jury, much less admitted to by the defendant. A sentencing court has two choices: On the one hand, she can look only to the formalities of the record—the language of the indictment to which the defendant pled, the meaning of the jury verdict as interpreted by the jury instructions—or the facts which the defendant admitted. On the other hand, she can try to evaluate the record *post hoc*, without the safeguards of a trial, to determine what the offense was "really" about—what the police report says, what the complaint application indicated.

Both the First Circuit and the Supreme Court have chosen the former. It plainly saves judicial resources. It avoids the legal equivalent of an archeological dig into past records. More importantly, it is by far the fairest approach. As a general matter, we, as a society, reject punishing someone based on facts that were never adjudicated, particularly where the defendant had no idea that the facts would have this added resonance. As I describe below, based on the formal record, I concluded that Shepard did not qualify as an Armed Career Criminal.

But concluding that Shepard did not qualify as an Armed Career Criminal did not mean that his substantial record would be ignored. The government also moved for an upward departure pursuant to U.S.S.G. § 4A1.3 (p.s.) based on the seri-

---

1.  Under U.S.S.G. § 4B1.4, Shepard's sentencing range would increase considerably from 30–37 months to 188–235 months.

ousness of Shepard's criminal history.[2] Again, evaluating only the formal record of Shepard's convictions, I found that the number of convictions, their timing, and their nature, all suggest that Shepard's criminal history understated his culpability and the likelihood of his recidivism. Accordingly, an upward departure was warranted.

Two hearings were held. The first, on July 7, 1999, focused on the ACC issue. The government asked the Court to accept facts taken from police reports and complaint applications as evidence to support its argument that at least five of Shepard's breaking and entering convictions were really burglaries (and thus "violent felonies") for purposes of the ACC enhancement. The second, on July 14, 1999, focused on the upward departure issue. The government urged the Court to consider the number, and "sheer industrious nature," of Shepard's prior convictions in enhancing his sentence. It then sought a sentence which, in effect, would have achieved the same result as an ACC finding.

In its objections to the pre-sentence report, Shepard opposed any factual recitations beyond the face of the complaints and specifically, any reference to police reports and complaint applications.

I departed upward by two levels. I sentenced Shepard to a term of imprisonment of forty-six months, followed by three years of supervised release. Furthermore, I ordered that Shepard participate in a 500 hour Comprehensive Drug Treatment Program, and attend a Batterer's Intervention Program.

## I. *GUIDELINE CALCULATIONS*

*Base Offense Level:*

The base level under U.S.S.G. § 2K2.1(a)(6)(A) is **14**.[3]

*Acceptance of Responsibility:*

Due to Shepard's guilty plea, he is entitled to a 2 level reduction under U.S.S.G. § 3E1.1(a). **Minus 2**

*Upward Departure:*

As discussed below, I concluded that an upward departure of two levels to 14 was appropriate. **Plus 2**

*Total Offense Level:*

Shepard's total offense level of **14,** and a criminal history category of VI, yields a sentencing range of 37–46 months. I sentenced him to the high end, at 46 months, and further, directed that he participate in a 500 hour Comprehensive Drug Treatment Program, and a Batterer's Intervention Program.

## II. *FACTS*

### A. *Background*

Shepard is a 37 year old man who has been involved with the criminal justice system for almost twenty years. As a young man, he witnessed his alcoholic father physically abuse his mother. Although his mother eventually kicked his father out when Shepard was 10 years old, she later became involved with another man who repeated the pattern, physically and emotionally abusing her, as well as Shepard and his sister. At age 16, Shepard finally moved out. He also withdrew from school, got a job as a security guard, and significantly, began using drugs.

Shepard's history of abuse, and his continued use of cocaine and marijuana limited his capacity to keep a job, or to maintain positive relationships. In at least

---

2. Indeed, the government did so at my invitation. After I indicated that I was not inclined to find Shepard an Armed Career Criminal, I invited the government to move for an upward departure, to be argued at a second sentencing hearing.

3. U.S.S.G. § 2K2.1(a)(6)(A) provides that the base offense level will be 14 if the defendant is a "prohibited person." A "prohibited person" is defined to include anyone who, like Shepard, is under indictment for, or has been convicted of a "crime punishable by imprisonment for more than one year." U.S.S.G. § 2K2.1 (App.Nt.6).

three of his relationships, drug use seemed to be what the couple shared most—in a rooming house in Mattapan, a rented apartment in Hyde Park, a Dorchester home. At the same time, perhaps the other side of drug filled days, at least four of the women obtained restraining orders against him.[4]

In 1988, Shepard tried to stop his drug habit by entering a rehabilitation program at Dimock Detoxification Center. After only six months of staying clean, however, he returned to drug use.

At sentencing, Shepard represented to the Court that he had voluntarily stopped using drugs since 1996. During part of that period, he was in the House of Correction. After his release in 1998, his girlfriend, Kathleen Cole, confirmed that he began attending Alcoholics Anonymous/Narcotics Anonymous ("A.A./N.A.") meetings. Shepard's family, who had largely rejected him because of his drug use, as I describe below, appeared in force at the sentencing hearing to buttress the

claim that he had finally addressed his problem.

## B. *Criminal History*

Since 1980, when he was 18 years old, Shepard has been on an 18–year crime spree.[5] But while lengthy, it is also the criminal history of a drug addict—a series of opportunistic, seemingly unplanned crimes, involving inappropriate targets with little chance of success. He is immediately apprehended; he pleads guilty and as soon as he is released, starts again.

### 1. *The Breaking and Entering Convictions*

Of particular importance to this case are Shepard's eleven convictions for breaking and entering,[6] at least five of which the government argues constitute burglaries. Probation and the defense disagreed, relying only on the language in the charging documents, the criminal complaints.[7] These complaints recite the boiler-plate language of the statutes, G.L. ch. 266 §§ 16, 18. And that language covers both

---

4. One of these orders was related to incidents involving Kathleen Cole, Shepard's present girlfriend. In May 1998, Shepard was arrested for, among other things, assault and battery of Kathleen Cole. According to a police report, Ms. Cole reported various acts of physical abuse from a man currently living in her house. This report lead to Shepard's arrest, but these charges were eventually dropped. Ms. Cole states that Shepard was not the man in her report.

5. The longest continuous sentence Shepard received in the House of Correction was for two years in July 1991, for Breaking and Entering in the Daytime.

The convictions during this 18 year time period include charges filed on 5/23/80 (threatening); 11/4/80 (trespassing); 2/9/81 (breaking and entering and larceny); 7/20/81 (possession Class D); 11/15/84 (assault and battery on a police officer); 6/19/85 (operating to endanger and larceny of a motor vehicle); 3/8/87 (shoplifting and trespassing); 10/13/87 (automobile offenses); 5/27/88 (automobile offenses); 11/2/88 (shoplifting); 11/21/88 (shoplifting and trespassing); 12/7/88 (shoplifting and trespassing); 3/2/89 (shoplifting); 4/18/89 (breaking and entering);

5/9/89 (threatening and possession Class B); 5/18/89 (breaking and entering); 5/23/89 (breaking and entering); 7/12/89 (breaking and entering); 7/17/89 (trespassing); 7/27/89 (trespassing); 10/11/90 (breaking and entering and possession of burglarious tools); 3/11/91 (breaking and entering); 7/18/91 (breaking and entering); 1/25/93 (threatening, trespassing, and larceny); 7/9/93 (threatening and shoplifting); 2/4/94 (malicious destruction of property and breaking and entering); 5/23/94 (knowingly receiving stolen property and threatening); 11/9/95 (breaking and entering and larceny); 2/29/96 (breaking and entering and possession of burglarious tools); 5/4/98 (threatening and malicious destruction of property); and 5/12/98 (assault and battery).

6. It is noted that one of these convictions— February 9, 1981—was not scored for purposes of the Criminal History computation under U.S.S.G. § 4A1.2(e) (out of applicable time period).

7. As these criminal cases were brought in Massachusetts District Court, Shepard was charged by Complaint, rather than by Indictment.

breaking and entering into a commercial structure or dwelling, which is "generic burglary," as I describe below, and breaking and entering into a vehicle or vessel, which is not.[8]

In an effort to prove the actual conduct involved, in particular the location of the crime (i.e. in a structure or a vehicle), the government supplied additional materials, such as complaint applications and police reports. While the Probation Department described the content of these materials in its amended Pre–Sentence Report ("PSR"), it did not alter its conclusion. It continued to maintain that it was bound to rely only on the formalities of the charges.

In each case, Shepard pleaded guilty to the generally worded complaint. Nothing suggested that the facts alleged in the complaint applications or the police reports were ever litigated, much less determined by a court or jury. At no point—then or now, during the various plea colloquies, or at this sentencing—did Shepard concede the facts on which the government now relies. Indeed, Shepard expressly contested any characterizations of these convictions that went beyond the words of the complaints.

### a. *April 18, 1989*[9]

Shepard was sentenced to 18 months in the House of Correction, 6 months committed, and the balance suspended. The complaint stated that on April 2, 1989, the defendant "did break and enter in the daytime, the building, ship or vessel of Crispus Attucks Children's Center with the intent to commit a felony therein in violation of G.L. c. 266, § 18." The complaint application suggested that a building was involved, alleging that Shepard gained access to the Children's Center by breaking a window, and in so doing, he put the Director of the Center in fear.

### b. *May 23, 1989*

The second conviction resulted in a 2 years suspended sentence and probation. On July 31, 1991, Shepard was found in violation of probation and committed to the House of Correction to serve his sentence. The complaint stated that on May 6, 1989, "the defendant did break and enter in the night time the building, ship, vessel, or vehicle, the property of Jerri Cothran, with intent to commit a felony therein, in violation of G.L. c. 266 § 16."

The complaint application and the Boston Police report implied that a home was involved. They alleged that Shepard gained entry by breaking down a cellar door, and was then observed inside the pantry by the owner of the house.

### c. *March 29, 1991*

For this conviction, Shepard was committed to the House of Correction for one year. The complaint stated that on March 11, 1991, "the defendant did break and enter in the night time, the building, ship, vessel or vehicle the property of Fretters,

---

**8.** The relevant statutes provide:

> Whoever, in the night time, breaks and enters a building, ship, vessel or vehicle, with intent to commit a felony, . . . shall be punished by imprisonment in the state prison for not more than twenty years, or in a jail or house of correction for not more than two and one-half years.

Mass.Gen.L. ch. 266 § 16 (1990). Statute was amended in September 1995 to include "or vehicle" language.

> Whoever, in the night time, enters a dwelling house without breaking, or breaks and enters in the day time a building, ship or motor vehicle or vessel, with intent to commit a felony, no person lawfully therein being put in fear, shall be punished by imprisonment in the state prison for not more than ten years or by a fine of not more than five hundred dollars and imprisonment in jail for not more than two years.

Mass.Gen.L. ch. 266 § 18 (1990). Statute was amended in November 1989, to include "or motor vehicle" language.

**9.** Although the government's brief states that this crime occurred on May 8, 1989, the facts described suggest that it intended to discuss the event which passed on April 2, 1989.

In discussing this offense, the government relies on the PSR, and does not supply any additional documentation.

with intent to commit a felony therein in violation of G.L. ch. 266 § 16."

The Watertown Police report suggested that the site was a commercial building. The report stated that two managers of Fretters were in the stockroom when they observed the back door open and Shepard enter. According to both employees, the door was locked, and they believed that to enter, Shepard used a key that he did not return to the store following his termination from employment there several weeks before.

### d. *July 18, 1991*

On this conviction Shepard was sentenced to two years in the House of Correction. The complaint stated that on July 18, 1991, "the defendant did break and enter in the day time the building, ship or vessel of Monica Collins with the intent to commit a felony therein, in violation of G.L. ch. 266 § 16."

The Boston Police report alleged that the officers responded to a radio call about a suspect in the hallway of a particular apartment building in Dorchester. Upon arrival, the officers observed Shepard walking away from the area carrying items from a particular apartment. Officers found that a panel on the third floor, front door had been broken, exposing the inside door lock.

### e. *February 4, 1994*

The final conviction resulted in a two year sentence, six months committed and the balance suspended. The complaint set forth that on February 3, 1994, "the defendant did break and enter in the day time the building, ship or motor vehicle or vessel of Russell McGaugh with intent to commit a felony therein, in violation of G.L. ch 266 § 18."

The police report stated that Shepard was observed attempting to gain entry into the stated address by turning several doorknobs. A police officer went to the rear of the property and observed Shep-

ard, with both hands through the glass partition, attempting to gain entry through another door. Upon seeing the police officer, Shepard fled, but was soon apprehended and placed under arrest.

### 2. *The Remainder of Shepard's Record*

Until the incident leading to the instant plea to Felon in Possession of a Firearm, Shepard was never charged with, or convicted of any crime involving the use or possession of a weapon. No weapon appears to have been involved in any of his prior offenses. Indeed, the vast majority of his offenses are within the jurisdiction of the state district court, for trespass, larceny, receiving stolen property, shoplifting, as well as breaking and entering.

### C. *This Incident*

On October 17, 1995, an Alcohol, Tobacco and Firearms ("ATF") agent, acting in an undercover capacity, met Shepard regarding a prearranged deal to sell firearms. During the meeting, which was recorded on tape, Shepard completed a hand-to-hand sale of a Glock 17, 9 mm pistol for $600.00, and various rounds of ammunition for an additional $20.00. On March 3, 1999, Shepard entered a plea of guilty to one count of Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g).

Defense counsel maintained that the deal was set up by an informant who needed to make deals to minimize his own sentence. Shepard, she suggested, because of his drug use, was vulnerable. It is clear that Shepard had not been targeted prior to this transaction. He simply fell into the net.

### D. *Other Facts*

At the sentencing hearing, Shepard claimed that he had begun to "turn his life around." Influential in this change was a woman, Kathleen Cole, whom he met in 1996 while he was at Plymouth House of

Correction. Cole is a certified Charge Nurse at Sunrise Care in Randolph, MA, and a certified physical trainer. During the period between March 1998 and September 1998 while he was out of jail, Shepard lived with Cole, managed to secure employment, attend A.A./N.A. programs and began counseling.[10] Since his detention at Wyatt on these charges, Cole moved to an apartment nearby. She visits him as often as is permitted and the couple writes to one another daily.

Finally, Shepard remarked on how his personal changes were also influenced by his rekindled relationship with his family, after many years of conflict because of his drug abuse. Indeed, he represented that in his lengthy criminal history not once had his family ever attended a court hearing. During the sentencing hearing on these charges, however, his Godmother, his sister, his niece, his sponsor at N.A., and his girlfriend were present.

### III. *LEGAL ANALYSIS*

#### A. *Armed Career Criminal*

The government maintained that Shepard was subject to an enhanced sentence under the provisions of 18 U.S.C. § 924(e). Specifically, it contended that Shepard qualified as an Armed Career Criminal pursuant to U.S.S.G. § 4B1.4(a). Under this provision, Shepard's base offense level would increase to **33**, from 14. *See* U.S.S.G. § 4B1.4(b)(3)(B).

Pursuant to U.S.S.G. § 4B1.4 and 18 U.S.C. § 924(e), a defendant is determined to be an Armed Career Criminal if the following conditions exist: (1) the instant offense of conviction is a violation of 18 U.S.C. § 922(g), and (2) the defendant has at least three prior convictions for a "violent felony" or "serious drug offense" committed on occasions different from one another. *See* U.S.S.G. § 4B1.4 (App.Nts).

The term "violent felony," as set forth in 18 U.S.C. § 924(e)(2), provides:

> The term 'violent felony' means any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use of, carrying of a firearm, knife or destructive device that would be punishable by imprisonment for such term if committed by an adult, that (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or (ii) is burglary, arson, or extortion, involves the use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.[11]

In *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), the Supreme Court considered whether the defendant's predicate offenses qualified as "burglary" as defined in 18 U.S.C. § 924(e). Not content to rely on how each state might define "burglary," the Court defined generic "burglary" as the "unlawful and unprivileged entry into or remaining in, a building or structure, with intent to commit a crime." *See* 495 U.S. at 599, 110 S.Ct. 2143. In order to determine whether the defendant was convicted of such an offense, the Court held that a sentencing court should narrow its inquiry to the fact of conviction, and whether the statute of conviction included the generic elements, rather than examining the facts underlying the convictions. This, it dubbed, was the "categorical" approach (which I have described as focusing on the formalities of the record). *See Taylor,* 495 U.S. at 600, 110 S.Ct. 2143; *United States v. Damon,* 127 F.3d 139, 141, 142 (1st Cir.1997).[12]

---

**10.** He reported that instead of medicating himself with illegal drugs to deal with anger and depression, he took prescribed medications, which appear to be working.

**11.** The government relied only on the argument that Shepard's prior convictions constituted "burglaries" under 18 U.S.C. § 924(e)(2).

**12.** Following *Taylor,* the First Circuit's analysis of predicate offenses has generally utilized this "categorical" approach. *See e.g., Damon,* 127 F.3d at 142 (citing *United States v. Mead-*

To be sure, the *Taylor* court noted there was a problem when a single state statute swept beyond the elements of generic burglary, including within it breaking and entering in places other than buildings or structures (namely vehicles or vessels), and where the defendant's plea tracks the statute. *See* 495 U.S. at 599, 110 S.Ct. 2143; *Damon,* 127 F.3d at 142. In such a case, while the sentencing judge may not hold a mini-trial on the particular facts underlying the prior offense, *see United States v. Dueno,* 171 F.3d 3, 4 (1st Cir. 1999) (citing *Damon,* 127 F.3d at 144; *Meader,* 118 F.3d at 882) he or she may "peek beneath the coverlet" of the formal language to ascertain whether the conviction was for a violent or a non-violent crime. *See Dueno,* 171 F.3d at 4 (citing *Winter,* 22 F.3d at 18). The question raised is how far that "peek" can go.

■ Not very far, is the answer; the exception to the categorical approach is a limited one. *See Taylor,* 495 U.S. at 600–602, 110 S.Ct. 2143; *Damon,* 127 F.3d at 142–46. The Court may consult "undisputed" and "accurate, judicially noticeable sources" for further guidance. *See Damon* 127 F.3d at 145, 147. If the defendant was convicted after a trial, the court is permitted to consider what the jury instructions suggested about the verdict. If the defendant pled, the court may consider what he admitted to at his plea. *See Damon,* 127 F.3d at 142; *United States v. Harris,* 964 F.2d 1234, 1236 (1st Cir.1992) (a court may consider the guilty plea when no jury instructions are available). Finally, if the relevant facts contained in the PSR are uncontested, the court may consider these as further admissions by the defendant. *See Dueno,* 171 F.3d at 7; *Harris,* 964 F.2d at 1236–37.

■ In this case, the breaking and entering statute under which Shepard pled guilty is the hybrid kind, covering conduct

which constitutes "generic burglary," and conduct which does not.[13] *See Taylor,* 495 U.S. at 598, 110 S.Ct. 2143; *Dueno,* 171 F.3d at 5 (refusing to find that all conduct described by Mass.Gen.L. ch. 266 § 16 is violent); *cf. Harris,* 964 F.2d at 1236 (assuming *in dicta* that breaking into and entering a vehicle is not a violent felony under the ACC). Each complaint does no more than mirror the statutory language. As a result, the government urges this Court to "peek" further to ascertain whether Shepard's crimes can be categorized as burglaries. The complaint applications and police reports, the government argued, suggested that the offenses involved breaking and entering into a "building" on all five occasions. Shepard objected, claiming that this was the very "archaeological dig" that the Supreme Court rejected.

I agreed with Shepard. Police reports and complaint applications do not meet the narrow exception to the categorical approach. They contain allegations that were never adjudicated before a judge or jury, never admitted by Shepard. In fact, there is no indication that the sentencing judge in the original case even had any of these documents available when he or she sentenced Shepard. *See Dueno,* 171 F.3d at 6 (noting that the government provided no documents which had been before the judge when the plea was accepted).

No plea colloquies or plea agreements were offered to suggest that Shepard adopted one version of the facts rather than another for each of the convictions. Moreover, because Shepard objected to the factual representations in the PSR, the government cannot rely on the characterizations found therein. *See Harris,* 964 F.2d at 1236–37.

In fact, not only did Shepard *not* litigate these facts, he had no idea he *had* to do so. These facts—the location of the breaking

---

*er,* 118 F.3d 876, 881–83 (1st Cir.1997); *United States v. Winter,* 22 F.3d 15, 18 (1st Cir. 1994); *United States v. DeJesus,* 984 F.2d 21, 23 (1st Cir.1993)).

**13.** For statutory language, *see supra* note 8.

and entering—were not necessary to his state plea. It is only now, years later, that they seem central because of a federal sentencing regime enacted years after Shepard pled.

Contrast Shepard's situation with that of a federal defendant pleading guilty today. Now, federal defendants who plead guilty make strategic decisions about which facts to contest and which to accept, carefully considering the impact their admissions will have on the ultimate sentence. The plea colloquy has assumed new significance, which it never had in the state court.

To attach such importance to facts neither litigated nor conceded violates the policies articulated by the Supreme Court in *Taylor*, and subsequent First Circuit precedent.[14] *See Taylor*, 495 U.S. at 600–602, 110 S.Ct. 2143 (unfair to impose a

sentencing enhancement based on the federal court, rather than the state court's review of the facts); *Dueno*, 171 F.3d at 6 (sentence defendant only for those specific "prior crimes of which he was convicted by a trier of fact or by his own admissions").[15]

The government concedes that without the police reports or complaint applications it cannot determine the precise conduct to which Shepard actually pled guilty. Accordingly, I found insufficient evidence to conclude that Shepard's three of the five guilty pleas constituted crimes of generic burglary. *See* U.S.S.G. § 4B1.4; 18 U.S.C. § 924(e). As such, the Armed Career Criminal enhancement did not apply.

### B. *Inadequate Criminal History Category*

■ The government argued that an upward departure is warranted and recom-

---

14. In *Damon*, the First Circuit articulated five important policy considerations supporting the categorical analysis. *See* 127 F.3d at 145–146. First, Congress intended the Guidelines themselves to take on a categorical approach to sentencing. Following such an approach leads to like cases receiving like sentences. *See id.* at 145. Second, using a categorical approach makes sense administratively as it only requires the court to look to readily available sources of undisputed information. Alternatively, a mini-trial on the facts would impose "an onerous burden, freighted with unusual evidentiary difficulties," which are time consuming and could be unfair. *Id.* at 146 (citing *Taylor*). Third, the court found that the categorical approach honors the choice of the state in its decisions concerning which crimes to prosecute and how plea bargains should be negotiated. Fourth, the categorical approach is more or less evenhanded. On the one hand, in cases like this one, the approach may lead to lesser sentences than would result if the actual conduct could be considered. On the other hand, the approach may lead to higher sentences in other cases where a certain crime is categorically considered a "violent felony" even if the actual conduct exhibited no such violence. *See id.* Finally, the Court emphasized that this is a sentencing *enhancement*. The defendant has already been punished once for his earlier offenses. The fact that the Court is not permitted to consider the underlying conduct does not mean that the defendant somehow escapes punishment altogether. *See id.*

15. I have raised like concerns before, in *United States v. Footman*, Cr. No. 98–10067–NG. In *Footman* I addressed the language in the Guidelines which appeared to permit a court to look at prior criminal conduct in evaluating criminal history, and not merely prior criminal convictions. U.S.S.G. § 4A1.3(e) permits the court to consider "prior similar adult criminal conduct not resulting in a criminal conviction," so long as the information is "reliable." U.S.S.G. § 4A1.3 (Background). This section refers only to an upward departure because of the adequacy of criminal history, which is a discretionary judgment on the part of the judge. It does not refer to the Armed Career Criminal provisions of U.S.S.G. § 4B1.4 where the consequences of a finding of a prior violent felony are automatic and draconian. Second, in *Footman*, I added that just because a judge is permitted to consider this information does not mean he or she should do so:

> Once one ventures past formal convictions, and formal sentences, one is in troubling territory. How can the court reconstruct prosecutions long past? Should the court essentially retry the past conduct, or rely on police reports which may well be skewed? And if a matter has been dismissed, or worse, resulted in an acquittal, how can the court, many years hence, substitute its judgment for that of the original decision-maker?

*Footman, supra* at 33.

mended a departure of twelve levels to an offense level of 24. Two questions were raised—the fact of an upward departure and the amount.

### 1. *Whether an Upward Departure is Warranted*

The Commission, pursuant to its authority under the Sentencing Reform Act, determined that a defendant's "past criminal conduct" [16] is directly relevant to the purposes of sentencing: An individual "with a record of criminal behavior" is more culpable than a first offender. Moreover, "[G]eneral deterrence" requires that a message be sent that "repeated criminal behavior" will aggravate the punishment.[17] Finally, the commission suggests a criminal record is correlated with recidivism on the one hand, and the limited likelihood of rehabilitation on the other.[18]

U.S.S.G. § 4A1.1 attempts to identify the factors which correlate with these characteristics. For the most part, the criminal history score is keyed to the length of the sentence that the individual received in state court.[19] Presumably, the longer the sentence, the more serious the underlying conduct must have been. Category VI, however, is the highest category, reserved for anyone with a criminal history score of 13 or more.

There are serious limitations with the approach which the Guidelines recognize. Policy statement U.S.S.G. § 4A1.3 (p.s.) suggests that for an egregious criminal record, the top guideline range, Criminal History Category VI, may not always be adequate to reflect the seriousness of the defendant's criminal history. *See* U.S.S.G. § 4A1. 3 (p.s.) Moreover, because of the way convictions are scored, an individual with five prior sentences for very large scale fraud, may have the same number of criminal history points (because of the

time he or she received for each), as another who had ten small offenses for which he or she received lesser sentences per case. The former would have a far more serious criminal record, warranting an upward departure. *See id.*

The government called for an upward departure on a number of grounds. It relied on the same argument as it did in insisting on ACC status, namely that some of Shepard's breaking and entering convictions in reality comprise burglaries which were "violent felonies." But as noted above, I did not make that finding.

Second, the government looks to the sheer number of convictions and the general nature of his criminal habits to support an increase.

The general methodology, which I outlined in *United States v. Footman, supra* (upward departure) on the one hand, and *United States v. Leviner,* 31 F.Supp.2d 23 (D.Mass.1998) (downward departure) on the other, is as follows:

> ... [W]hat is it about the [criminal history] score which created the under (or over) valuation of the record?: (i) prior sentences not counted in computing criminal history (e.g., foreign sentences), (ii) prior sentences of "substantially more than one year" that derive from independent crimes on different occasions, *see* § 4A1.3(a) and (b); (iii) the timing of convictions—did they follow closely one after another, or while another charge was pending, *see* U.S.S.G. § 4A1.3(d); and (iv) the nature of the convictions,—e.g., assaultive behavior or non-violent conduct.

*Leviner,* 31 F.Supp.2d at 32–33.

Here, categories (iii) and (iv) as described in *Leviner,* are significant. Shepard's criminal history score is 39, three times the number triggering Category VI.

---

**16.** U.S.S.G.Ch. 4, Intro. Comment.

**17.** *Id.*

**18.** *Id.*

**19.** In addition, the score is increased if the offense was committed while on supervision, or shortly after being released from prison. *See* U.S.S.G. § 4(A)1.1(d)(e).

Moreover, the timing of the convictions bespeaks someone who is out of control—committing one crime after another while on supervision, shortly after being released.

Shepard, however, emphasizes the nature of the convictions. He has never been charged with offenses that might have warranted a Superior Court indictment as opposed to a complaint in District Court. None of his prior offenses involved firearms; most are shoplifting, trespassing, motor vehicle infractions, receiving stolen property, breaking and entering.

But while the offenses did not involve firearms *per se*, and may not formally be "violent crimes" or "burglaries" under U.S.S.G. § 4B1.4, the record, however characterized, still suggests the likelihood of recidivism. One does not have to "peek beneath the coverlet" to conclude this.

## 2. *Extent of Departure*

### a. *Degree of Departure*

In calculating the appropriate offense level when the Criminal History Category is already VI, the Guidelines instruct the Court to depart by moving incrementally down the sentencing table to the next higher offense level until it finds the range appropriate for the case. *See* U.S.S.G. § 4A1.3 (p.s.).

In determining "appropriateness," I am guided by the statute creating the Federal Sentencing Guidelines, the Sentencing Reform Act. It directs me to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth …" 18 U.S.C. § 3553(a).

While Shepard's record suggests recidivism, it also suggests an out of control

drug addict. Shepard gets out of jail, and returns to drugs, and the crimes he must commit in order to afford the drugs. Whatever sentence I impose must also include serious attention to Shepard's addiction. I have been told by the Probation Department that a sentence in the Guideline range of 30–37 months would not qualify Shepard for participation in the intense drug treatment program of the Bureau of Prisons.[20] Only a sentence at 46 months or more would suffice.

Shepard has never before served a federal sentence in a prison far from home. He has never served more than 2.5 years, and never in any institution other than the House of Correction. A departure to offense level 14, a Guideline range of 37–46, and a sentence at the high end, would be "sufficient," but not "greater than necessary" to meet all purposes of the Sentencing Reform Act.[21]

As such, I sentenced Shepard as follows:

I departed up two levels, to an offense level of 14. The Guideline range for this level at Criminal History Category VI is 37–46 months. I sentenced Shepard to 46 months in prison, with three years supervised release. In addition, I recommended that Shepard participate in the 500 hour Intensive Drug Treatment program in the Bureau of Prisons and directed him to send periodic reports to me of his progress.

**SO ORDERED.**

## AMENDED SENTENCING MEMORANDUM

This Amended Sentencing Memorandum is issued to cure typographical errors only

---

**20.** The Bureau of Prisons considers only the amount of time in its custody in calculating the prerequisites for the intensive drug treatment program. A guidelines sentence, minus the amount already served in pre-trial detention, will not suffice.

**21.** The purposes set forth in 18 U.S.C. § 3553(a)(2) are:

(A) to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense;
(B) to afford adequate alternatives to criminal conduct;
(C) to protect the public from further crimes of the defendant, and;
(D) to provide the defendant with needed educational or vocational training, medical care or other corrective treatment in the most effective manner.

which appeared in the original September 27, 1999, Sentencing Memorandum. All other aspects of the original remain intact here.

**SO ORDERED.**