UNITED STATES of America,

v.

Eddie GAUTIER, Defendant.

Criminal No. 06cr0036–NG.

United States District Court,
D. Massachusetts.

Dec. 23, 2008.

Oscar Cruz, Jr., Timothy G. Watkins, Federal Defender's Office District of Massachusetts, Boston, MA, for Eddie Gautier.

William D. Weinreb, United States Attorney's Office, John A. Wortmann, Jr., United States Attorney's Office, Boston, MA, for United States of America.

*SENTENCING MEMORANDUM*

GERTNER, District Judge:

## TABLE OF CONTENTS

I. INTRODUCTION .................................................. 219

II. FACTS ........................................................ 220

III. DISCUSSION ................................................... 221
 A. Whether Gautier's 2001 Crime of Resisting Arrest under Mass. Gen. Laws Ch. 268, § 32B Is a Violent Felony ................................. 221
 1. *Whether the Crime Defined by Prong (2) of § 32B Is a Violent Felony Under 18 U.S.C. § 924(e)(2)(B)(i)* ........................... 223

2. Whether the Crime Defined by Prong (2) of § 32B Is a Violent
Felony Under 18 U.S.C. § 924(e)(2)(B)(ii) ............................223
B. Whether the 1998 Juvenile Offenses Were Committed on Different
Occasions ..............................................................229
1. Legal Standard ....................................................229
2. Whether the Inquiry Is Limited to Shepard-approved Source
Material ............................................................230
3. The 1998 Offenses ................................................232

IV. THE SENTENCE ..........................................................234
A. The Guidelines Computation ........................................234
B. 18 U.S.C. § 3553(a) Factors .......................................234
1. Nature and Circumstances of the Offense..........................234
2. Deterrence; Public Safety .......................................234
C. Rehabilitation ....................................................235

## I. INTRODUCTION

Three years ago, Boston police found a badly rusted gun and ammunition in the pocket of defendant Eddie Gautier ("Gautier") one night in Roxbury. The offense stemmed from a night of drunken carousing; the gun was completely inoperable.[1] Though he was originally arrested by state officers, possession of an inoperable gun did not constitute a crime under state law. The federal government took up the case, charging Gautier with being a felon in possession of a firearm, pursuant to 18 U.S.C. § 922(g)(1), because of his prior record. His prior convictions include two armed robberies from 1998, when he was 16, and a resisting arrest charge from 2001, when he was 20. (He is presently 27.) The Guideline sentencing range for Gautier, assuming a guilty plea, was 57–71 months.

But the government wanted more punishment for Gautier. It contended that these convictions compelled the application of a fifteen-year mandatory minimum sentence under the Armed Career Criminal Act ("ACCA"). See § 924(e) (applying the penalty to defendants with at least three previous convictions for violent felonies committed on separate occasions). I disagree.

In passing the ACCA, "Congress focused its efforts on career offenders—those who commit a large number of fairly serious crimes as their means of livelihood, and who, because they possess weapons, present at least a potential threat of harm to persons." Taylor v. United States, 495 U.S. 575, 587–88, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). Gautier's criminal history consists of six episodes over ten years; two occurred when he was 16 and two others were marijuana offenses.[2] The

1. The ballistics report observed that "a portion of the trigger guard is broken off, the ejector rod collar is out of place, the ejector rod spring is defective, the ejector rod will not secure the cylinder in the closed position, the cylinder hand is not making contact with the cylinder, and neither the trigger nor the hammer can be drawn back to the firing position. There is rust on the cylinder, the ejector, the crane, and the trigger. This weapon cannot be fired in its present condition and in my opinion it would require extensive work and new parts to return this weapon to a state in which it can be discharged." Boston Police Ballistic Unit Case Notes, Def.'s Sent. Mem., Ex. B (document # 60–2).

2. His prior convictions include offenses committed in the course of two armed robberies perpetrated on the same day in 1998; marijuana possession and distribution in 2001; resisting arrest and trespassing in 2001; possession with intent to distribute marijuana in 2005; and attempted breaking & entering and possession of burglarious tools (screwdriver) in 2004. See Pre-sentence Report ("PSR") ¶¶ 35–40.

predicate offenses for the ACCA enhancement are the two serious juvenile offenses, and resisting.

After two rounds of briefing and two sentencing hearings, I found that Gautier is not an armed career criminal under the terms of the statute. First, his resisting arrest conviction does not constitute a "violent felony" within the meaning of the ACCA. Second, and in the alternative, court records were ambiguous on the question of whether his 1998 offenses were "committed on occasions different from one another" as the statute requires. As a result, Gautier lacks the requisite three predicate offenses and the mandatory minimum does not apply.

Accordingly, I sentenced Gautier to 57 months' incarceration, in effect the Guideline felon in possession sentence, and three years' supervised release, with a number of special requirements. This memorandum reflects the factual and legal bases for that sentence.

## II. FACTS

On the night of January 6, 2006, Eddie Gautier had come to the Archdale Housing Project to visit his mother. He decided to meet four friends who were out celebrating two of their birthdays. About 10:30 p.m., two Boston police officers patrolling the Archdale Housing Project in an unmarked police car approached the group. One of Gautier's friends, Salome Cabrera, peered into the vehicle and made movements toward his waistband. The officers exited the car, badges displayed, and walked to Cabrera. Cabrera then allegedly shouted "get the burner" (slang for gun), a comment Gautier claimed he did not hear, and the police responded by drawing their weapons on the group.

They arrested and searched all five, finding a .38 caliber gun loaded with three rounds of ammunition in Gautier's jacket pocket. An examination later revealed that the gun was completely inoperable.[3]

Gautier was transferred to federal custody on February 8, 2006, and indicted on February 15, 2006, on one count of felon in possession of a firearm and one count of felon in possession of ammunition, both pursuant to 18 U.S.C. § 922(g)(1). Subsequent to his arrest, he agreed to speak to federal agents and police investigators, admitted to possessing the gun, and divulged where it had come from. Indeed, according to his counsel, the defendant repeatedly offered to plead guilty to the charge, but was advised against it because of the possibility of an ACCA minimum mandatory sentence of 15 years.

Counsel for Gautier sought a pre-plea Pre Sentence Report ("PSR"). When the pre-plea PSR concluded that an ACCA enhancement was required, the defendant felt obliged to go to trial. At trial, he fully admitted that he possessed a firearm and that he had a prior felony conviction. His defense was that he had picked up the gun and held it momentarily, to keep it from a group of younger, intoxicated friends in a dangerous area of Boston.

The jury rejected his claim, convicting him of both counts on July 18, 2008. He has been incarcerated since his arrest on January 6, 2006.

At the first sentencing hearing on October 15, I asked the government to brief whether resisting arrest qualifies as an ACCA predicate, an issue raised in the defendant's objections to the presentence report. On that date, I also raised sua sponte the issue of whether the juvenile

---

**3.** Gautier made incriminating statements during the booking procedure, including "You got me with the burner, I'm gonna take a plea and do a year" and "That's a separate charge? Of course it's gonna have bullets in it, it's a gun." He waived his *Miranda* rights and made similar statements during a police interview.

offenses Gautier committed in 1998 were clearly separate predicates. At the final sentencing hearing on December 15, 2008, after reviewing the parties' submissions, I concluded that the ACCA enhancement was not warranted, principally because of the resisting arrest conviction but based on alternative findings concerning the two 1998 convictions, as well.

## III. DISCUSSION

Gautier's conviction for being a felon in possession of a firearm pursuant to 18 U.S.C. § 922(g)(1) subjects him to the enhancement provision of the Armed Career Criminal Act. That statute provides:

> In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years....

18 U.S.C. § 924(e)(1). Gautier's sentencing memorandum and recent Supreme Court decisions raise two potential obstacles to the applicability of the sentencing enhancement: First, Gautier's conviction for resisting arrest may not be a "violent felony" under the ACCA. Second, the government may have difficulty establishing, on the basis of source material deemed appropriate by the Supreme Court, that the 1998 offenses were "committed on occasions different from one another."

### A. Whether Gautier's 2001 Crime of Resisting Arrest under Mass. Gen. Laws Ch. 268, § 32B Is a Violent Felony

The ACCA defines "violent felony" as any crime punishable for a term exceeding one year that "(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B).

▮▮▮ Courts are obliged to apply a categorical approach to determining whether a criminal offense is a violent felony; that is, they look to the statutory definition of the prior offense and not to the facts underlying the conviction. *See Taylor,* 495 U.S. at 600, 602, 110 S.Ct. 2143. Put simply, the issue is what the defendant was convicted of, or what he pled to, or what he admitted in the sentencing proceeding, not what he actually did. *United States v. Shepard,* 181 F.Supp.2d 14, 16 (D.Mass.2002).[4] Where such a substantial enhancement is involved

---

**4.** In *United States v. Shepard,* 125 F.Supp.2d 562, 569–70 (D.Mass.2000), I held that a sentencing judge could not look to any underlying police reports or complaint applications that had not been adopted by the defendant when determining whether prior convictions were "burglaries" under the ACCA. The First Circuit reversed, holding that police reports could be considered if they "constituted sufficiently reliable evidence of the government and the defendant's shared belief that the defendant was pleading guilty" to a generically violent crime. *United States v. Shepard,* 231 F.3d 56, 70 (1st Cir.2000). I then concluded that the central question was, what did the defendant plead to in state court, and that the police reports did not provide reliable evidence on that central question. *United States v. Shepard,* 181 F.Supp.2d 14, 17 (D.Mass.2002). The First Circuit again reversed, holding that the police reports could be considered and instructing me to apply to ACCA mandatory minimum. *United States v. Shepard,* 348 F.3d 308, 315 (1st Cir.2003). The Supreme Court then reversed the court of appeals, holding that a sentencing court may not look to police reports or complaint applications not made a part of the plea or colloquy or adopted by defendant, in determining whether a defendant had pleaded to a violent felony. *Shepard v. United States,* 544 U.S. 13, 16, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005).

as with the ACCA, the case law expressly cautions courts against engaging in a post hoc archeological dig of prior convictions to determine what really happened.

■ Problems of interpretation arise when a state statute on which the predicate charge was based encompasses both violent felonies, which may qualify for ACCA treatment, and nonviolent felonies, which do not. In such a case, while the sentencing judge "may not hold a mini-trial on the particular facts underlying the prior offense," *see United States v. Dueno*, 171 F.3d 3, 5 (1st Cir.1999) (citing *United States v. Damon*, 127 F.3d 139, 144 (1st Cir.1997); *United States v. Meader*, 118 F.3d 876, 882 (1st Cir.1997)), he or she may "peek beneath the coverlet" of the formal language to ascertain whether the conviction was for a violent or a nonviolent crime, *see United States v. Winter*, 22 F.3d 15, 18 (1st Cir.1994). The question, now unequivocally answered by the Supreme Court in *Shepard v. United States*, 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005), is how far that "peek" can go.

■ "Not very far, is the answer." *United States v. Shepard*, 125 F.Supp.2d 562, 569 (D.Mass.2000) (citing *Taylor*, 495 U.S. at 600–02, 110 S.Ct. 2143; *Damon*, 127 F.3d at 142–46.) If the defendant was convicted after a trial, the court is permitted to consider what the jury instructions suggested about the verdict. When a defendant's conviction resulted from a guilty plea rather than trial, those sources include the charging document, the plea agreement, a transcript of the plea colloquy, any facts confirmed by the defendant at sentencing, and any comparable judicial record. *See Shepard*, 544 U.S. at 26, 125 S.Ct. 1254. Finally, if the relevant facts contained in the PSR are uncontested, the court may consider these as further admis-

sions by the defendant. *See Dueno*, 171 F.3d at 7; *United States v. Harris*, 964 F.2d 1234, 1236–37 (1st Cir.1992).

■ Defendant claims that the Massachusetts resisting arrest statute embodies both violent and nonviolent offenses and, further, that nothing in the record of Gautier's 2002 plea to the charge establishes that the plea was to the violent version of the felony. Under the Massachusetts statute, a person is guilty of the offense if he knowingly prevents or attempts to prevent an officer from effecting an arrest by "(1) using or threatening to use physical force or violence against the police officer or another; or (2) using any other means which creates a substantial risk of causing bodily injury to such police officer or another." Mass. Gen. Laws ch. 268, § 32B(a). The government correctly points out that Prong (1) of this definition clearly defines an ACCA violent felony, as it "has as an element the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i); *see* Gov't Sent. Mem. 3 (document # 62). Prong (2) of the resisting arrest statute, however, does not.

Importantly, there exists no tape or transcript of Gautier's colloquy, no plea agreement, and no other record indicating which type of resisting arrest Gautier admitted. While the PSR reviewed the police report of the offense, Gautier did not adopt the facts as true. Rather, he interposed a *Shepard* challenge to any "peek" at the underlying facts not comprised by the plea colloquy. Accordingly, as in *Shepard*, the criminal complaint to which Gautier pleaded is the only extant evidence I may consider, and it simply lists the offense and provides its full statutory definition.[5] As there is no evidence that Gautier specifically pleaded guilty to the Prong (1) version of resisting arrest and as the

---

5. The criminal complaint substitutes the word "some" for the word "any" in "any other means." This discrepancy is of no consequence in this case.

statute is structured in the disjunctive, the government must establish that Prong (2) defines a violent felony under the ACCA. It cannot.

### 1. Whether the Crime Defined by Prong (2) of § 32B Is a Violent Felony Under 18 U.S.C. § 924(e)(2)(B)(i)

By its own terms, the Prong (2) definition of resisting arrest does not qualify as a violent felony under the first definition laid out in the ACCA. That is, the language "using any other means which creates a substantial risk of causing bodily injury to such police officer or another," Mass Gen. Laws. ch. 268, § 32B(a), does not explicitly "ha[ve] as an element the use, attempted use, or threatened use of physical force against the person of another," 18 U.S.C. § 924(e)(2)(B)(i). Moreover, the fact that the Prong (1) definition of resisting arrest *does* contain such an element, coupled with Prong (2)'s specification of resistance by "other means," suggests that Prong (2) does not involve such an element by implication, either.

### 2. Whether the Crime Defined by Prong (2) of § 32B Is a Violent Felony Under 18 U.S.C. § 924(e)(2)(B)(ii)

If Prong (2) of the Massachusetts resisting arrest statute defines a violent felony for the armed career criminal mandatory minimum, it must do so under the second definition provided by the ACCA. Since resisting arrest is obviously not one of the enumerated offenses—burglary, arson, extortion, or a crime that involves the use of explosives—the inquiry focuses on what has been called the residual clause of the ACCA statute. *See James v. United States,* 550 U.S. 192, 127 S.Ct. 1586, 1591, 167 L.Ed.2d 532 (2007). The issue is whether resisting arrest "using any other means which creates a substantial risk of causing bodily injury to such police officer or another," in the language of the Massachusetts statute, Mass. Gen. Laws. ch. 268,

§ 32B, "involves conduct that presents a serious potential risk of physical injury to another," in the language of the ACCA, 18 U.S.C. § 924(e)(2)(B)(ii).

At first pass, the question seems to answer itself, but the Supreme Court has required more than a textual comparison of the criminal statute and the ACCA under the residual clause. In *Begay v. United States,* — U.S. —, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008), in which the Supreme Court ruled that drunk driving was not a violent felony under the ACCA, Justice Breyer described a two-step process for determining whether a conviction is a "violent felony" under the residual provision of § 924(e)(2)(B)(ii). Where the offense in question is not one of those enumerated in the statute, a court must determine not only (1) whether that offense "involves conduct that presents a serious risk of physical injury to another," but also (2) whether the crime is "roughly similar, in kind as well as in degree of risk posed, to the" enumerated offenses. *Id.* at 1585. The latter step is critical here. It requires a court to decide whether the offense in question typically involves "purposeful, violent, and aggressive behavior"—the defining feature of the enumerated offenses.

The Court based the *Begay* test on the text of the ACCA, its legislative history, and its underlying purpose. As to text, the court noted that the presence of the enumerated offenses of burglary, arson, extortion and crimes involving explosives "indicates that the statute covers only *similar* crimes, rather than *every* crime that 'presents a serious potential risk of physical injury to another.'" *Id.* Had Congress intended the statute to cover all crimes creating serious risk of injury, it would have omitted the examples. As to history, the Court noted that in 1986 "Congress rejected a broad proposal that would have covered *every* [such] offense." *Id.* at 1586.

Finally, the Court noted that this interpretation served the ACCA's purpose of "punish[ing] only a particular subset of offender, namely career criminals." *Id.* at 1588:

> The listed crimes all typically involve purposeful, "violent," and "aggressive" conduct.... That conduct is such that it makes [it] more likely that an offender, later possessing a gun, will use that gun deliberately to harm a victim.... Were we to read the statute without this distinction, its 15–year mandatory minimum sentence would apply to a host of crimes which, though dangerous, are not typically committed by those whom one normally labels "armed career criminals."

*Id.* at 1586–87 (citations omitted).

In *Begay,* the Court assumed without deciding that drunk driving involves conduct that "presents a serious potential risk of physical injury to another." *Id.* at 1584. Even so, it held under the second step of the analysis that a conviction for driving under the influence ("DUI") falls outside the scope of the residual clause because "[i]t is simply too unlike the provision's listed examples for us to believe that Congress intended the provision to cover it." *Id.* at 1584

 Moreover, the Supreme Court has held that in conducting this analysis, courts need not analyze "every conceivable factual offense covered by a statute," but rather should consider "the ordinary case" of the offense. *James,* 127 S.Ct. at 1597. In the words of the First Circuit, I must evaluate the degree of risk posed by "the mine-run of conduct that falls within the heartland of the statute." *United States v. De Jesus,* 984 F.2d 21, 24 (1st Cir.1993); *see also United States v. Doe,* 960 F.2d 221, 224–25 (1st Cir.1992) (holding that the

crime of being a felon in possession of a firearm is not a violent felony under the ACCA because risk of physical harm does not "often accompany[ ] the conduct that normally constitutes" the offense); *United States v. Sacko,* 178 F.3d 1, 4 (1st Cir.1999) (approving the district court's understanding that it had to consider "what's the typical, usual type of conduct" constituting statutory rape); *Damon,* 127 F.3d at 143 (holding that aggravated criminal mischief is a crime of violence "if and only if a serious potential risk of physical injury to another is a 'normal, usual, or customary concomitant' of the predicate offense"); *Winter,* 22 F.3d at 20 ("A categorical approach is not concerned with testing either the outer limits of statutory language or the myriad of possibilities girdled by that language; instead, a categorical approach is concerned with the usual type of conduct that the statute purports to proscribe.").

 To determine the mine-run of conduct encompassed by Prong (2) of the resisting arrest statute, I examine its application in the Massachusetts state courts. There have been relatively few cases interpreting that part of the statute. In *Commonwealth v. Grandison,* 433 Mass. 135, 741 N.E.2d 25 (2001), the Supreme Judicial Court ruled that the defendant's stiffening his arms and pulling one away for a second to avoid being handcuffed constituted resisting arrest by a "means which creates a substantial risk of causing bodily injury" to the officers involved. *Id.* at 144–45, 741 N.E.2d 25. In *Commonwealth v. Maylott,* 65 Mass.App.Ct. 466, 841 N.E.2d 717 (2006), an intermediate appellate court likewise held that a defendant resisted arrest under Prong (2) when he stiffened his arms and refused to put his hands behind his back.[6] *Id.* at 468–69, 841 N.E.2d 717. In another case, a state court declined to

---

**6.** The court noted that the conduct could also constitute resisting arrest under Prong (1) of

the statutory definition. *Id.* at 719.

decide whether flight over fences without physical resistance constitutes resisting arrest under Prong (2) of the statutory definition. *Commonwealth v. Grant*, 71 Mass. App.Ct. 205, 210 n. 2, 880 N.E.2d 820 (2008). These cases indicate that while Prong (1) of the resisting arrest statute covers the actual or threatened use of force, the mine-run of conduct criminalized by Prong (2) involves a lesser version of "active, physical refusal to submit to the authority of the arresting officers": paradigmatically, the stiffening of one's arms to resist handcuffing. *Maylott*, 65 Mass.App. Ct. at 469, 841 N.E.2d 717.[7]

▮ Under the first prong of the *Begay* analysis, I must determine whether the Prong (2) definition of resisting arrest "presents a serious potential risk of physical injury to another." Stiffening one's arms to prevent handcuffing, the usual conduct prosecuted under Prong (2), sometimes does and sometimes does not present a serious risk of injury, and at least one court has suggested this inconsistency as a ground for finding that a criminal offense fails to satisfy this part of the test. *See United States v. Urbano*, No. 07–10160–01–MLB, 2008 WL 1995074, at *2 (D.Kan. May 6, 2008) (holding on these grounds that fleeing or attempting to elude a police officer in a motor vehicle is not a "violent felony" for ACCA purposes) ("While an individual can, and often does, cause serious personal injury or death while attempting to flee from the police, the statute also charges behavior which would arguably not cause serious personal

injury."). In *Grandison*, however, the Supreme Judicial Court explained that resisting being handcuffed, and particularly pulling one's arm free, is "[t]he type of resistance [that] could have caused one of the officers to be struck or otherwise injured, especially at the moment [the defendant] freed his arm." 433 Mass. at 145, 741 N.E.2d 25.

Even assuming arguendo that the conduct typically prosecuted under Prong (2) of the resisting arrest statute presents a serious potential risk of injury to another, that form of resisting arrest cannot fulfill the second part of the *Begay* test. The crime is not "roughly similar, in kind as well as in degree of risk posed, to the" enumerated offenses. *Begay*, 128 S.Ct. at 1585.

First, looking to the degree of risk: Even if the *Grandison* court is correct that stiffening one's arms and pulling away present a serious risk of harm to another, the degree of that risk does not approach that posed by burglary, arson, extortion, or crime involving use of explosives. The Supreme Court has explained that burglary presents a high risk of violence due to "the possibility of a face-to-face confrontation between the burglar and a third party ... who comes to investigate." *James*, 127 S.Ct. at 1594; *see also United States v. Winn*, 364 F.3d 7, 11 (1st Cir.2004) (describing this as the "powder keg" rationale). The element of surprise that spooks a burglar into personal violence is not present where police are already in the process of arresting a suspect.[8] It is

---

7. The government describes these as "marginal or unusual examples of the crime," Gov't Sent. Mem. 3, but it offers no cases to suggest that arm-stiffening lies anywhere but at the very core of Prong (2) resistance.

8. Last month, the Supreme Court heard argument in a case presenting the question of whether failure to report to prison is a violent felony under the ACCA. *Chambers v. United States*, No. 06–11206, 2008 WL 4892841 (U.S.

Nov. 10, 2008). This case presents the Court with an opportunity to reevaluate the powder keg theory, under which most circuits have found that such convictions *are* violent felonies because they create a risk of violent confrontation when law enforcement officials attempt to take the defendant into custody. The Seventh Circuit held as a matter of stare decisis that failure to report was a violent felony, though it emphasized that "it is an

measurably less likely that injury will result from the stiffening of one's arms than that it will result from a burglary, the setting of a structure on fire, unlawfully demanding property or services through threat of harm, or the detonation of explosive devices.[9]

Second, looking to the "in kind" test, whether Prong (2) resistance is similar in kind to the enumerated offenses: This inquiry requires me to determine whether the offense involves "purposeful, violent, and aggressive behavior." In *Begay*, the Court held that drunk driving does not fulfill the test because the offender does not possess the purpose or intentional aggression that characterizes the enumerated offenses. 128 S.Ct. at 1586–87 ("[S]tatutes that forbid driving under the influence ... criminaliz[e] conduct in respect to which the offender need not have had any criminal intent at all."); *see also United States v. Gray*, 535 F.3d 128, 131–32 (2d Cir.2008) (holding that reckless endangerment is not a crime of violence because it is not intentional). But as the First Circuit recognized in *United States v. Williams*, 529 F.3d 1 (1st Cir.2008), some crimes fall "neither within the safe harbor of offenses with limited scienter requirements and uncertain consequences (like DUI ...), nor among those that have deliberate violence as a necessary element or even as an almost inevitable concomitant." *Id.* at 7 (citation omitted). Prong (2) resistance is such a crime.

The First Circuit recently explained that "all three types of conduct—i.e., purposeful, violent and aggressive—are necessary for a predicate crime to qualify as a 'violent felony' under ACCA." *United States v. Herrick*, 545 F.3d 53, 58–59 (1st Cir.2008). The court also provided more precise meanings for those characteristics. It explained:

> The Supreme Court ... use[d] "purposeful" interchangeably with "intentional." [*Begay*, 128 S.Ct.] at 1587–88. Perhaps because it is common sense that a DUI is not violent or aggressive in an ordinary sense, the Supreme Court did not define those terms or explain in other than conclusory terms why a DUI was not violent or aggressive. We note, therefore, that aggressive may be defined as "tending toward or exhibiting aggression," which in turn is defined as "a forceful action or procedure (as an unprovoked attack) esp. when intended to dominate or master." Merriam–Webster's Collegiate Dictionary 24 (11th ed. 2003). Violence may be defined as "marked by extreme force or sudden intense activity."

*Id.* at 58. Applying these definitions, the court held that a conviction under a Wisconsin statute for homicide by negligent operation of a motor vehicle was not a "crime of violence" under the career offender sentencing guidelines.[10] *Id.* at 59. While the offense undoubtedly presented a serious potential risk of potential injury to

---

embarrassment to the law when judges make decisions about consequences based on conjectures, in this case a conjecture as to the possible danger of physical injury posed by criminals who fail to show up to begin serving their sentences." *United States v. Chambers*, 473 F.3d 724, 726–27 (7th Cir.2007).

9. Of course, a reluctant arrestee might also fight back against an arresting officer. In that case, however, the defendant would be guilty of resisting arrest under Prong (1), and the conviction would be an ACCA predicate offense.

10. The First Circuit has repeatedly held that "[g]iven the similarity between the ACCA's definition of 'violent felony' and the definition of 'crime of violence' contained in the pertinent guideline provision, ... authority interpreting one phrase is generally persuasive when interpreting the other." *Williams*, 529 F.3d at 4 n. 3; *see also Damon*, 127 F.3d at 142 n. 3; *Schofield*, 114 F.3d at 352; *Winter*, 22 F.3d at 18 n. 3.

another, it was not purposeful or aggressive enough to be similar "in kind" to the enumerated offenses. *Id.*

A similar conclusion obtains here. To be sure, the Prong (2) form of resisting arrest is purposeful in that a defendant who stiffens or pulls away his arm certainly intends to do so (though he may not intend to expose others to risk of injury). It is differently purposeful, however, from the interstate transport of a minor for prostitution, which the First Circuit held in *Williams* constituted a "crime of violence" under the career offender provision of the sentencing guidelines. 529 F.3d at 7–8. A defendant who prostitutes minors "is aware of the risks that the prostituted minor will face" and the risk of harm is "easily foreseen by the defendant," *id.* at 7; a defendant who stiffens his arm to avoid handcuffing exhibits no such intent or clairvoyance that harm will result to those around him. Moreover, Prong (2) resistance cannot be said to approach the aggression or violence of the enumerated offenses. *See, e.g., Taylor,* 495 U.S. at 581, 110 S.Ct. 2143 (noting that Congress considered burglary "one of the 'most damaging crimes to society' because it involves 'invasion of [victims'] homes or workplaces, violation of their privacy, and loss of their most personal and valued possessions'" (quoting H.R.Rep. No. 98–1073, at 1, 3, 1984 U.S.Code Cong. & Admin.News 3661, 3663)). Arm-stiffening is not characterized by the force or domination impulse that the First Circuit has held defines aggression, and it lacks the extreme force and sudden intenseness required by the court's definition of violence. *See Herrick,* 545 F.3d at 60.

Nor does it resemble those offenses previously held by the First Circuit and the district courts in its jurisdiction to constitute violent felonies or crimes of violence under the residual clause. *See United States v. Walter,* 434 F.3d 30 (1st Cir.2006) (manslaughter); *United States v. Sherwood,* 156 F.3d 219 (1st Cir.1998) (child molestation); *United States v. Fernandez,* 121 F.3d 777 (1st Cir.1997) (assault and battery on a police officer); *United States v. Schofield,* 114 F.3d 350 (1st Cir.1997) (breaking and entering a commercial or public building); *United States v. De Jesus,* 984 F.2d 21 (1st Cir.1993) (larceny from a person); *United States v. Fiore,* 983 F.2d 1 (1st Cir.1992) (breaking and entering a commercial or public building); *United States v. Patterson,* 882 F.2d 595 (1st Cir.1989) (unauthorized entry of the premises of another); *United States v. Cadieux,* 350 F.Supp.2d 275 (D.Me.2004) (indecent assault and battery on a child under 14); *United States v. Sanford,* 327 F.Supp.2d 54 (D.Me.2004) (assault and battery); *Mooney v. United States,* 2004 WL 1571643 (D.Me. Apr. 30, 2004) (breaking and entering a commercial building); *United States v. Lepore,* 304 F.Supp.2d 183, 189 (D.Mass.2004) (indecent assault and battery on a person over 14 years old). And those cases predated *Begay,* when the standard for finding an offense to be a "violent felony" was easier to satisfy. In light of the difference in aggression and violence between resisting arrest and the offenses previously held to be ACCA predicates, Prong (2) resistance does not resemble the enumerated offenses in the "'way or manner' in which it produces" risk of injury. *Begay,* 128 S.Ct. at 1586.

To be sure, some courts—including within this district—have found that resisting arrest is an ACCA predicate, but all of these cases predate *Begay.*[11] *Begay*

---

**11.** In *United States v. Person,* 377 F.Supp.2d 308 (D.Mass.2005), Judge Ponsor faced the question of whether a conviction for resisting arrest was a prerequisite "crime of violence"

under the career offender guideline, U.S.S.G. § 4B1.1. He confessed "hesitation" based on "the uncertain impact of the Supreme Court's

"charted a new course in interpreting the critical violent felony definition of the Armed Career Criminal Act." *Williams*, 529 F.3d at 6. Significantly, in a recent post-*Begay* case in this court, Judge Zobel rejected the government's contention that a prior conviction under the Massachusetts resisting arrest statute constituted a "crime of violence" under the career offender guidelines. *United States v. Kristopher Gray*, No. 07–10337–RWZ, 2008 WL 2563378 (D.Mass. Jun. 24, 2008) (sentencing defendant without written opinion to twenty-four months imprisonment for conviction under 18 U.S.C. § 922(g)). In another post-*Begay* case on resisting arrest, the U.S. District Court for the District of Kansas held that the crime of fleeing and eluding an officer is not a crime of violence because "the statute also charges behavior which would arguably not cause serious personal injury" and because resisting arrest "is not similar to the listed crimes set forth" in § 924(e)(2)(B)(ii). *Urbano*, 2008 WL 1995074, at *2. Importantly, the district court so held despite the existence of a

2005 precedent concluding that the resisting arrest *was* a crime of violence. The court explained its about-face as required by *Begay*. *Id.* at *2.

In light of the Supreme Court's pronouncement in *Begay*, then, I find that the Prong (2) version of resisting arrest is not a "violent felony" under the ACCA. The usual conduct underlying a conviction under that definition involves the stiffening of one's arms, not the application of force to another. Even assuming that such conduct creates a serious potential risk of physical injury, it certainly does not resemble the enumerated offenses either in degree of risk or in kind.

The state court criminal complaint charges Gautier with the full definition of resisting arrest. Because the government cannot establish that he pleaded to Prong (1) rather than to Prong (2)—as it must—it cannot look to this conviction for a qualifying violent felony. Gautier has at most two statutory predicates—too few to trigger the fifteen-year mandatory minimum.

recent decision in *Shepard* " and the fact that the resisting arrest statute "allow[s] constructions, under certain circumstances, that would not qualify [it] always as '[a crime] of violence.' " *Id.* at 310. Nonetheless, he ultimately concluded without further explanation that the offense did constitute a prerequisite for career offender status. In *United States v. Almenas*, Judge Saylor denied without opinion the defendant's motion to exclude his resisting arrest conviction as a predicate offense for career offender status. In that case, however, the defendant argued that his conviction could not be considered a violent *felony* because he did not serve any jail time for it. (*Almenas* is now on appeal at the First Circuit. *See Almenas v. United States*, No. 06–2513. Because the parties in that case have urged the court to remand the case on alternative grounds—namely, because the district court judge understood himself to have less discretion than actually afforded him under *Gall v. United States*, —— U.S. ——, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007), and *Kim-*

*brough v. United States*, —— U.S. ——, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007)—I resolve the issue here.) In *United States v. Wardrick*, 350 F.3d 446 (4th Cir.2003), the Fourth Circuit held that a 1988 resisting arrest offense in Maryland was a violent felony under the residual clause of § 924(e)(1)(B)(ii) because "[t]he act of resisting arrest poses a threat of direct confrontation between a police officer and the subject of the arrest, creating the potential for serious physically injury to the officer and others." *Id.* at 455. Because the court made no attempt to identify the type of conduct that usually underlies the conviction, I do not know how the statute at issue there compares to the one at issue here. Finally, the Eighth Circuit held in *United States v. Hollis*, 447 F.3d 1053 (8th Cir.2006), that resisting arrest was a "crime of violence" under U.S.S.G. § 4B1.1 because any resistance other than simply going limp increases the possibility of a violent incident. *See id.* at 1055.

## B. Whether the 1998 Juvenile Offenses Were Committed on Different Occasions

### 1. *Legal Standard*

■ That Gautier's resisting arrest conviction is not a violent felony is enough to preclude the application of the ACCA enhancement. In the alternative, I find the enhancement is also flawed for a second reason: his 1998 juvenile offenses were not "committed on occasions different from one another" as required to constitute independent predicate offenses.[12] 18 U.S.C. § 924(e)(1). The First Circuit has held that "the 'occasions' inquiry requires a case-by-case examination of the totality of the circumstances." *United States v. Stearns*, 387 F.3d 104, 108 (1st Cir.2004). Factors in that examination include the "identity of the victim; the type of crime; the time interval between the crimes; the location of the crimes; the continuity *vel non* of the defendant's conduct; and/or the apparent motive for the crimes." *Id.*

As one would expect from Congress' use of the word "occasion," the First Circuit has focused on the element of time. The *Stearns* court summarized that the statute distinguishes between, on the one hand, "a time interval during which defendant successfully has completed his first crime, safely escaped, and which affords defendant a 'breather,' viz., a period (however brief) which is devoid of criminal activity and in which he may contemplate whether or not to commit the second crime," and on the other, "a time lapse which does not mark the endpoint of the first crime, but merely the natural consequence of a continuous course of extended criminal conduct."[13] 387 F.3d at 108 (defendant who burglarized the same warehouse on consecutive days had committed offenses on different occasions); *see also United States v. Ramirez*, No. CR–05–71–B–W, 2007 WL 4571143, at *6 (D.Me. Dec. 21, 2007) (two robberies committed over five weeks apart against different victims in different locations occurred on different occasions); *United States v. Mastera*, 435 F.3d 56, 60 (1st Cir.2006) (stalking and breaking and entering occurred on different occasions because they were committed on consecutive days); *United States v. Mollo*, No. 97–1922, 1997 WL 781582, at *1 (1st Cir. Dec. 17, 1997) (per curiam) (defendant who robbed liquor store in Greenwich and thirty minutes later robbed variety store in Stamford had committed offenses on different occasions); *Harris*, 964 F.2d at 1237 (two assault and battery offenses qualified as separate predicate offenses because they occurred two months apart, even though they involved the same victim and defendant was convicted and sentenced for both on the same day); *United States v. Gillies*, 851 F.2d 492, 497 (1st Cir.1988) (armed robberies of different drugstores on consecutive days occurred on different occasions for the purposes of the ACCA, even though defendant received concurrent sentences).

---

12. The government urged me to consider this alternative holding, even though it had not fully briefed it, in order to avoid addressing this issue on a remand, in the event of resentencing.

13. This view accords with the guidance provided to trial judges in other circuits. *See, e.g., United States v. Martin*, 526 F.3d 926, 939 (6th Cir.2008) (drug offenses that were several days apart occurred on different occasions because "it is possible to discern the point at which the first offense is completed and the second offense begins"); *United States v. Pope*, 132 F.3d 684, 692 (11th Cir. 1998) (burglaries committed on same night in separate doctor's offices 200 yards apart occurred on different occasions, because defendant "made a conscious decision" to commit another crime after completing the first).

## 2. Whether the Inquiry Is Limited to Shepard-approved Source Material

Again, in order to apply the above legal standard to the facts of Gautier's prior felony convictions, I must answer an antecedent question: from what sources may I glean those facts? As explained above, the Supreme Court has directed courts to apply a "categorical approach" to determining whether a prior conviction qualifies as a "violent felony" and thus predicate offense under the ACCA. *Taylor v. United States*, 495 U.S. 575, 588, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). In the case of a guilty plea, the Court has limited district courts to "the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information." *Shepard*, 544 U.S. at 26, 125 S.Ct. 1254. The issue I confront here is whether this same source restriction applies to my consideration of whether two offenses were "committed on occasions different from one another." 18 U.S.C. § 924(e)(1).

The First Circuit has never ruled on this issue. In a pre-*Shepard* case, the court "express[ed] no opinion" on the lower court's citation of *Taylor* for the proposition "that district courts normally should not look beyond the indictment when determining whether a prior conviction is the type countable under the ACCA." *Stearns*, 387 F.3d at 107. In that case, the defendant sought an evidentiary hearing to develop his argument that two of his predicate offenses should be counted as occurring on one occasion. The district court interpreted *Taylor* to forbid such an involved inquiry and denied his motion, but because the defendant accepted the judge's ruling without objection, the First Circuit held he could not raise the issue on appeal. In a post-*Shepard* case, *United States v. Walter*, 434 F.3d 30 (1st Cir. 2006), the First Circuit again declined to resolve the issue. The defendant argued it was error for the district court to use facts gleaned from police reports and described in the PSR to find that two drug offenses disposed of on the same day were in fact "committed on occasions different from one another." *Id.* at 38. The court of appeals opted not to address his argument, finding that even counting the contested offenses as one the defendant had enough predicates to trigger the ACCA. *Id.* at 40.

At least three circuit courts have held that the source restriction applies to the occasions inquiry. The Fourth Circuit held in *United States v. Thompson*, 421 F.3d 278 (4th Cir.2005), that the "ACCA's use of the term 'occasion' requires recourse only to data normally found in conclusive judicial records, such as the date and location of an offense, upon which *Taylor* and *Shepard* say we may rely." *Id.* at 286 (upholding trial judge's reliance on the PSR to find that three burglaries occurred on separate occasions where that information was derived from *Shepard*-approved sources such as indictments and where defendant never objected to the details in the PSR); *see also United States v. Williams*, 223 Fed.Appx. 280, 283 (4th Cir. 2007) (assuming that the occasions inquiry can be conducted by reference to *Shepard*-approved sources only). In *United States v. Fuller*, 453 F.3d 274 (5th Cir.2006), the Fifth Circuit vacated an ACCA enhancement where the court could not establish on the basis of *Shepard*-approved material that the predicate offenses were committed on different occasions. *Id.* at 279; *see also United States v. Bookman*, 197 Fed. Appx. 349, 350 (5th Cir.2006) (per curiam) (vacating defendant's sentence where the sequence of his predicate offenses was not established by *Shepard*-appropriate mate-

rial). The Tenth Circuit has held that a criminal sentence enhanced by the ACCA should be vacated and remanded when it is unclear whether the sentencing court limited itself to Shepard sources in determining whether the defendant's prior crimes were committed on different occasions. *See United States v. Harris*, 447 F.3d 1300, 1305 (10th Cir.2006); *United States v. Taylor*, 413 F.3d 1146, 1157–58 (10th Cir. 2005). Several district courts have come to the same conclusion. *See, e.g., United States v. Carr*, No. 2:06–CR–14–FL–1, 2008 WL 4641346, at *2 (E.D.N.C. Oct. 16, 2008) (limiting the occasions inquiry to facts available in *Shepard*-approved material), including at least one court in a circuit that disavows this application of the *Shepard* source restriction, *see Watts v. United States*, Nos. 8:04–cr–314–T–24MAP, 8:07–cv–665–T–24MAP, 2007 WL 1839474, at *4 (M.D.Fla. June 26, 2007) (accepting the applicability of *Shepard* and holding that the trial court "properly reviewed the charging documents to determine that the offenses occurred on three separate occasions").

By contrast, three circuits have held that the source restriction applies only to the violent felony inquiry and not to the occasions inquiry. The Sixth Circuit has been most emphatic: "All of our opinions on this issue have involved consideration of the specific facts underlying the prior convictions. Indeed, we cannot imagine how such a determination could be made without reference to the underlying facts of the predicate offenses." *United States v. Thomas*, 211 F.3d 316, 318 n. 3 (6th Cir. 2000). The Seventh Circuit has likewise allowed sentencing judges to venture beyond the decisional documents envisioned by *Taylor*, reasoning that these only rarely provide the details that reveal whether offenses were committed on separate occasions, *see United States v. Hudspeth*, 42 F.3d 1015, 1019 n. 3 (7th Cir.1994) (holding "[a]s a practical matter" that *Taylor* does not restrict the occasions inquiry), and the Eleventh Circuit has held on the same grounds that the question is "unsuited to a categorical approach," *United States v. Richardson*, 230 F.3d 1297, 1300 (11th Cir. 2000).

Importantly, however, these cases came down *before* the Supreme Court reaffirmed its commitment to the categorical approach in *Shepard*. *But see United States v. Hendrix*, 509 F.3d 362, 375–76 (7th Cir. 2007) (affirming the district court's use of the PSR to determine that defendant had three predicates from different occasions for the ACCA).

I find that the former approach is more faithful to the Supreme Court's rulings in *Taylor* and *Shepard* and makes sense in terms of the application of the very severe ACCA. As I explained in my remand opinion in *Shepard*, the Supreme Court's categorical approach "caution[s] the judge against becoming embroiled in a 'daunting' factual inquiry about what had actually happened at the time of the state offense." *United States v. Shepard*, 181 F.Supp.2d 14, 21 (D.Mass.2002). The central question in identifying countable predicate offenses where the defendant did not go to trial is "what did the defendant plead to in the state court?" *Id.* at 17. Where a defendant has not been found guilty by a jury, it is only fair to punish him for the prior conduct that he actually admits, either by pleading to the facts alleged or failing to object to them at sentencing.[14]

---

**14.** The *Shepard* Court came to this conclusion in part to avoid any potential *Apprendi* problem:

> The sentencing judge considering the ACCA enhancement would ... make a disputed finding of fact about what the defendant

and state judge must have understood as the factual basis of the prior plea, and the dispute raises the concern underlying *Jones* [*v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999)] and *Apprendi* [*v. New Jersey*, 530 U.S. 466, 120 S.Ct.

In light of the Supreme Court's caution in this area and the judgment of the courts of appeals, I find that I am limited to "the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented" in determining whether the defendants prior offenses were committed "on occasions different from one another." *Id.* at 16.

### 3. *The 1998 Offenses*

In the instant case, the only *Shepard*-approved sources available to me in deciding whether the 1998 offenses occurred on different occasions are the state court indictments and Gautier's plea tenders. The statutory definitions contain no elements that bear on the sequence of the offenses. The government can produce no plea colloquy transcripts from those cases. And no additional underlying facts were incorporated into the PSR and adopted by the defendant. PSR ¶¶ 35–36 (repeating the details provided in the indictments and specifically stating that police reports were not received).

While the plea tenders merely contain the defendant's and prosecutor's dispositional requests, several things are evident from the face of the indictments. In Suffolk Superior Court case no. 98–10175, the grand jury returned a two-count indictment charging Gautier with armed robbery (knife) and assault and battery against a victim named "F.L." In Suffolk Superior Court case no. 98–10177, the grand jury returned a five-count indict-ment charging Gautier with assault with a dangerous weapon (knife and/or gun) with intent to steal a motor vehicle; armed robbery (knife and/or gun); kidnaping; assault and battery with a dangerous weapon (shod foot); and assault and battery with a dangerous weapon (water bottle) against one "E.M." Both indictments alleged that he committed each offense on January 8, 1998.

The indictments indicate that on January 8, 1998, Gautier assaulted F.L. and that on the same day, he tried try to steal E.M.'s car, robbed him of $25.00, and confined or imprisoned him against his will. Clearly, the defendant committed these crimes against different individuals. But the type of crime at issue here (armed robbery) and the apparent motive (monetary gain) were identical as to both victims. Crucially, specific as they are, the charging documents do not reveal the location of the crimes, the time interval between the offenses, or the continuity of the conduct. It is therefore not "possible to discern the point at which the first offense is completed and the second offense begins." *United States v. Martin*, 526 F.3d 926, 939 (6th Cir.2008). Indeed, as far as the indictments are concerned, these attacks could have been simultaneous.

Finally, I consider whether the mere fact that the offenses against F.L. and those against E.M. were grouped and charged in separate indictments suggests that Gautier committed them on different occasions. It is well settled that there is no one-to-one correspondence between in-

2348, 147 L.Ed.2d 435 (2000)]: the Sixth and Fourteenth Amendments guarantee a jury standing between a defendant and the power of the State, and they guarantee a jury's finding of any disputed fact essential to increase the ceiling of a potential sentence.
*Shepard*, 544 U.S. at 25, 125 S.Ct. 1254. The Court explained that while *Almendarez–Torres*

*v. United States*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), allows a judge to find a disputed prior conviction, "the disputed fact here … is too far removed from the conclusive significance of a prior judicial record, and too much like the findings subject to *Jones* and *Apprendi*, to say that *Almendarez–Torres* clearly authorizes a judge to resolve the dispute." *Id.*

dictments and predicate offenses. *See, e.g., United States v. Brown,* 181 Fed. Appx. 969, 971 (11th Cir.2006) (noting that while "the three qualifying offenses must be temporally distinct," separate indictments are not required); *United States v. Howard,* 918 F.2d 1529, 1538 (11th Cir. 1990). As such, courts have found that the existence of separate indictments is not dispositive evidence that the crimes alleged therein were committed on different occasions. *See, e.g., United States v. Alcantara,* 43 Fed.Appx. 884, 886–87 (6th Cir.2002) (three separate indictments for offenses all committed "on or before November 30" did not establish that the offenses occurred on "occasions different from one another" for the purpose of the ACCA); *cf. United States v. Goetchius,* 369 F.Supp.2d 13, 16–17 & n. 6 (D.Me. 2005) (holding that *Shepard*'s source restriction governs determinations of whether prior crimes were "related" under the Sentencing Guidelines criminal history provisions, then ruling that the existence of separate indictments did not mean they

were unrelated). This conclusion applies with the same force to the instant case. Prosecutors have wide discretion as to the form of criminal charging. Under Massachusetts Rule of Criminal Procedure 9(a)(2), the Commonwealth "may" charge two or more related offenses in the same indictment, and it may not. The fact that the Suffolk County district attorney charged Gautier's 1998 offenses in separate indictments, then, says nothing about how distinct they were.

■■■■ As no *Shepard*-approved material establishes that Gautier experienced "a period . . . devoid of criminal activity and in which he may contemplate whether or not to commit the second crime," *Stearns,* 387 F.3d at 108, I cannot fairly conclude that he committed the armed robberies "on occasions different from one another." By the terms of the ACCA itself, the 1998 offenses do not provide more than a single predicate. This result provides a secondary reason the mandatory minimum does not apply to Gautier.[15]

---

**15.** In still another challenge to the mandatory minimum, Gautier argues that based on the definitional provisions of the ACCA, one of his January 8, 1998 criminal episodes does not qualify as a "violent felony." The argument proceeds in several steps. First, an offense is not a "violent felony" unless it is "punishable by imprisonment for a term exceeding one year," 18 U.S.C. § 924(e)(2)(B), and a crime is not punishable by imprisonment for a term exceeding one year if it has been "set aside" under state law, § 921(a)(20). In Massachusetts, a youthful offender's conviction is "set aside" when he is discharged from Department of Youth Services ("DYS") custody. *See* Mass. Gen. Laws ch. 120, § 21. Gautier notes that for one of the two indictments on which he was convicted in 1998, he was adjudicated a youthful offender, committed to DYS custody, and then discharged at age 21. Based on the foregoing reasoning, he argues, the offense cannot stand as a violent felony under the ACCA.

The ACCA, however, is not absolute in refusing to count convictions that have been set

aside. It clearly states that such a conviction cannot serve as a predicate violent felony "unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possession, or receive firearms." § 921(a)(20). Where a defendant's conviction is set aside by automatic operation of statutory law, rather than by personalized determination, this "unless clause" is read to include restrictions applied by state statutory law. *See United States v. Caron,* 77 F.3d 1, 4 n. 5 (1st Cir. 1996) (quoting *United States v. Glaser,* 14 F.3d 1213, 1218 (7th Cir.1994)). Here, Gautier's discharge from DYS was accomplished by statute, Mass. Gen. Laws. ch. 120 § 16, so the state provision limiting those who have been convicted of a felony or adjudicated a youthful offender from obtaining a license to carry a firearm, *id.* at ch. 140 § 131(d)(i), applies to him. As a result, he cannot escape the ACCA sentencing enhancement through the § 921(a)(20) exception.

## IV. THE SENTENCE

### A. The Guidelines Computation

 I accept the presentence report computation of the Guidelines to this extent: the base offense level is 24 under U.S.S.G. § 2K2.1(a)(2). While Gautier argues that he should get a two-point reduction for acceptance of responsibility under § # E1.1(a) and (b), I disagree at least as Guidelines interpretation is concerned. I consider this issue in connection with the 3553(a) factors (see below). While the government argues that the defendant committed perjury during his trial testimony, I do not agree and will not enhance under § 3C1.1. I also agree that Gautier's criminal history is category IV under § 4A1.1(d) and (e). The Guidelines range, then, is 63–78 months.

### B. 18 U.S.C. § 3553(a) Factors

Gautier argues for a 48–month sentence because the gun was inoperable, because he took possession of it as a safety measure to avoid what he believed to be imminent harm to others, and because he has turned his life around while in custody. I can find no clear rationale for a variance on these bases. Nevertheless, I find a 57–month sentence sufficient but not greater than necessary to achieve the purposes of 3553(a) for the following reasons:

#### 1. *Nature and Circumstances of the Offense*

Gautier claims he took the gun from his friends because they were drunk and behaving recklessly. Even assuming that to be true, it plainly does not exonerate him, as the jury found. Given his record, he should not have put himself in a position where the offense was even possible: in the Archdale projects, with drunk and disorderly compatriots, so much as touching a firearm. Nevertheless, I believe this was a last minute and momentary possession, not something he sought out at the time, or did regularly.

#### 2. *Deterrence; Public Safety*

Gautier cooperated with the authorities from the outset. He told them what he knew, offered to plead guilty, but was advised otherwise by his counsel. He went to trial on the advice of his attorney to preserve his challenge to the ACCA.[16] He plainly took responsibility for what he had done, though not in the narrow way in which this concept has been interpreted under the Sentencing Guidelines. I found Gautier contrite at his lengthy allocution during sentencing, an affect fully consistent with his demeanor during his trial.

He has faced substantial challenges in his life. Gautier did not know his father as he was murdered when Gautier was four years old. His mother remarried and the family then relocated from Puerto Rico, his birthplace, to Providence, Rhode Island, and then to Boston after a fire damaged their home. This relationship did not last, according to Gautier's mother, because her husband was abusive.

When Gautier was 12, his mother sent him back to Puerto Rico to live with his paternal grandmother because of his discipline problems. He stayed there until age 16 when he returned to Massachusetts. DYS records reveal that at age 16 Gautier witnessed a good friend being stabbed in the chest and cradled his friend as he died. After this incident another good friend

---

**16.** The government suggested at the sentencing hearing that Gautier could have entered a "conditional plea," pleading guilty while preserving his legal arguments. For all intents and purposes, that is what his trial accomplished. Gautier admitted he was a felon and admitted that he possessed the gun. He attempted to explain that possession to the jury. Given the enormity of the ACCA enhancement, I credit his counsel's advice and the motivation for the trying the case.

died of complications relating to pneumonia.

Soon thereafter, he was committed to DYS for a number of offenses. He was released on parole at age 17, but was in and out of custody until age 21 due to the offenses described above.

Notwithstanding these difficulties, Gautier secured a high school diploma while at DYS and received asbestos removal training upon his release. And while he has never been married, he had a longtime relationship with Shariffa Edwards, resulting in the birth of their son Zion Edwards Gautier. The couple parted company when Gautier was incarcerated.

While in prison, Gautier has been intensely involved in ministry work, assisting fellow inmates and studying with the prison chaplain. Gautier spoke movingly of this work. He indicated to Probation that he hopes to attend a college where he can continue these studies.

Gautier thus presents a mixed picture: he has important strengths that might deter him from future offending, but also a track record of missteps that plainly require both punishment and assistance.

## C. Rehabilitation

Gautier has made efforts to give his life structure, but needs more. I have required Probation to devise a recommended plan for him, both as a recommendation for the Bureau of Prisons during the period of his incarceration and as a template for his supervised release afterwards. Studies suggest the significance on recidivism of a consistent plan, beginning in prison and extending into reentry. Laurie Robinson & Jeremy Travis, 12 Fed. S.R. 258 (2000). In addition to that plan, as a condition of supervised release, Gautier is

17. Base offense level 24, minus 3 for acceptance of responsibility, and criminal history

to speak at high schools or to other young men identified by Probation as "at risk."

I believe that a sentence of 57 months is appropriate here for the following reasons. It marks the low end of the Guidelines range that he would have faced, 57–71 months, had he been charged with felon in possession, without the ACCA enhancement, and pled to that offense as he had wanted to do.[17] That sentence combines the Guidelines' values with those of § 3553(a).

**SO ORDERED.**